IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:15-CR-00346-F-1

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | O R D E R |
| | ) | |
| JIMMY CECIL LANE, JR., | ) | |
| Defendant. | ) | |

This matter is before the court on Jimmy Cecil Lane, Jr.'s Motion to Suppress [DE-23].

The issues have been fully briefed, and the matter is now ripe for ruling. On March 17, 2016, the

court held a hearing on the motion to further develop the record. For the reasons addressed

below, Lane's Motion to Suppress is DENIED.

### I. Findings of Fact

Based on the evidence produced during the suppression hearing, as supplemented on

April 20, 2016, the court renders the following findings of fact:

On Monday, March 2, 2015, at about 12:51 a.m., Corporal Hansen, a law enforcement

officer with Apex Police Department, was on patrol in a marked Tahoe in Pinnacle Park.

Pinnacle Park is a business park made up of about forty businesses with their mailboxes on the

road. At that time of the night, none of the businesses were open. Corporal Hansen was in a

parking lot in an area that had previously been a spot where crimes had occurred, such as mail

theft and damage to property.[1] Corporal Hansen observed a car, a Pontiac Bonneville, pass by

---

[1] Corporal Hansen was aware of prior crime in the Pinnacle Park area. In particular, two
weeks prior to March 2, 2015, she had taken calls for several mailbox break-ins, one taking place
across the street from the entrance to Pinnacle Park. In another instance, mailboxes were
damaged and mail was taken from a location inside Pinnacle Park.

slowly on Classic Road heading west toward Burma Street. Corporal Hansen decided to follow the Bonneville and see what they were doing.

There was no traffic in the area, and Corporal Hansen pulled out onto the road to follow the Bonneville as it headed westbound. Corporal Hansen was at some distance behind the Bonneville, and there were no other vehicles on the road. When the driver of the Bonneville got to the stop sign, he stopped and made a right turn onto Lufkin Road. Then, the Bonneville accelerated quicky as if he was trying to get away from Corporal Hansen. Corporal Hansen made the right turn and followed behind the Bonneville.

Corporal Hansen observed the Bonneville for 1.3 to 1.4 miles before it pulled into a Sheetz gas station. The Bonneville parked "nose in" near the entrance to Sheetz in the second stall, which was non-handicap. Corporal Hansen pulled her car in to the very far left facing Ten Ten Road. Corporal Hansen made sure not to block the Bonneville from backing out. Corporal Hansen called into communications and advised them that she would be out with the Bonneville.

As Corporal Hansen was contacting communications, the passenger in the Bonneville, James Adam Campbell, got out and went into the store. The driver, Lane, did not immediately get out of the car. As Corporal Hansen was getting out of her car, Lane got out of his car and started to walk toward the store's front door.

Corporal Hansen asked Lane, "Do you mind if I talk to ya?"

Lane responded, "Yeah." Corporal Hansen interpreted this response to mean that it was okay to talk.

Both Lane and Corporal Hansen walked a little toward each other. Corporal Hansen asked Lane where they were from. Lane responded that they were from Fayetteville, which

Corporal Hansen knew is some distance from Apex.

Corporal Hansen asked Lane, "So what you guys doing up here from Fayetteville?"

Lane responded, "Coming to see some girls." Corporal Hansen explained that in that area of Apex, there are no bars, clubs, or restaurants. There are only two convenience stores and nothing else.

Corporal Hansen asked, "Some girls where at?"

Lane responded, "That I don't know."

As Corporal Hansen and Lane were talking, Campbell was still in the store. Corporal Hansen explained that every once and awhile Campbell would look out the store's windows to see what was going on.

Corporal Hansen asked Lane, "You got a driver's license, man?"

Lane responded, "Yes."

Corporal Hansen asked, "Is it valid?"

Lane responded, "Yeah. I'm still waiting on the hard copy."

Corporal Hansen responded, "Right. But is it valid?"

Lane replied, "Yeah."

Lane leaned into the car and spent about a minute looking for his driver's license. Lane was looking in the glove box, and Corporal Hansen could not see his hands. Corporal Hansen asked Lane whether there was anything in the car she needed to be aware of, but he did not respond. Corporal Hansen felt it was taking longer than expected for Lane to produce his driver's license. Lane told Corporal Hansen that he remembered his license was in his wallet. Lane opened his wallet and pulled out a twenty-day temporary paper license from the Division of

3

Motor Vehicles ("DMV"), which is actually a receipt from DMV that states they will mail you a license. There was no picture on this paper license, only a driver's license number, a name, and an address.

Officers Warren and Boyd heard on their radio that Corporal Hansen was getting out of her car to deal with two subjects. At the point when Lane handed over his paper license to Corporal Hansen, Officers Warren and Boyd arrived on the scene at the Sheetz gas station. Officers Warren and Boyd parked with the nose of their car to the rear of Lane's car. Their car was parked perpendicular to and partially blocking Lane's car.

Corporal Hansen let Officer Warren know that there was a guy in the store who was involved in the incident. Corporal Hansen asked Officer Boyd to watch Lane so she could check his license. At the time, Lane was sitting in the driver's seat of his car with the door open. Corporal Hansen asked Officer Warren to keep an eye on Campbell, who was still inside the store.

Officer Boyd made small talk with Lane. When Officer Boyd looked down, he saw the handle of what appeared to be a machete beside the driver's seat and the floor of Lane's vehicle. Officer Boyd motioned for Officer Warren to come over.[2] Officer Boyd took the machete, which was about two feet in length, and showed it to Corporal Hansen. Officer Boyd then secured the machete.

Corporal Hansen went back to her car and got on her computer to run Lane's name through a program called C.J. Leads, which provides a driver's license picture. Corporal Hansen

---

[2] Officer Boyd couldn't recall if he and Officer Warren removed Lane or whether Officer Warren just watched Lane while Officer Boyd recovered the machete.

4

learned that Lane's commercial[3] A driver's license had been revoked. Corporal Hansen called communications and had them run the driver's license through the Division of Criminal Information ("DCI"). The telecommunicator advised Corporal Hansen that Lane's driver's license was revoked and had a pick up order[4].

While Corporal Hansen was back at her car running Lane's license, Officer Boyd came back to her car holding a large machete in a sheath. Officer Boyd reported that the machete was concealed in between the driver's seat and the door of Lane's car. Officer Boyd and Corporal Hansen discussed charging Lane with carrying a concealed weapon. Corporal Hansen asked Officer Boyd if he wanted to charge Lane. Officer Boyd said he didn't care either way, and it depended if they wanted to have something to charge Lane with.

About the time the information came back that Lane's license had been revoked, Corporal Hansen advised Officer Boyd that Lane's driver's license was revoked with a pick up order and if Officer Boyd felt comfortable with the concealed weapon charge, they would arrest Lane for driving while license revoked ("DWLR") and for having a concealed weapon. Corporal Hansen and Officer Boyd agreed that Corporal Hansen would charge Lane with DWLR and Officer Boyd would charge Lane with having a concealed weapon. Corporal Hansen stated that Lane had no reason to be in Apex, and she knew he was stealing. Corporal Hansen said that she knew it was his description she had seen on a bulletin.

Officer Boyd felt there was an issue of officer safety, and he wondered if there might be

---

[3] A driver can operate a vehicle falling within or below the class of their license. A revoked license of *any* type means that the driver cannot lawfully operate a vehicle.

[4] A pick up order directs the officer to take up the license and return it to DMV.

5

additional weapons in Lane's car. Corporal Hansen advised Lane that his license was revoked, and they were taking him into custody for DWLR and for having a concealed weapon. Lane was placed in custody. Officers Boyd and Warren searched Lane's car. Officer Warren found a ten-inch hunting knife under Campbell's seat and also located a .45 handgun. Officers Boyd and Warren found some marijuana and fifteen to sixteen pieces of U.S. mail that were addressed to businesses in Pinnacle Park. Officers Boyd and Warren also found magazine pouches, ammunition, and debit and credit cards not bearing Lane or Campbell's names.

Corporal Hansen advised her supervisor on duty about the situation and asked him to come out to the scene to give them guidance. The sergeant arrived at the scene, and Corporal Hansen briefed him. While Corporal Hansen was briefing the sergeant, Officers Boyd and Warren located another knife in Lane's car. This knife was found under Campbell's seat.

At this point in time, Campbell had come out of the store and up to the officers. Corporal Hansen and Officer Boyd discussed it and decided they would arrest Campbell for a concealed weapon. Corporal Hansen and Officer Boyd went over to Campbell and advised him that he was under arrest for a concealed weapon. Campbell was placed in the front seat of Corporal Hansen's car.

Corporal Hansen tried to locate an email she had seen about suspects who had been breaking into mailboxes in the next town over. Corporal Hansen wanted to see if she could connect Lane and Campbell with the guys in the information she had received. Corporal Hansen didn't find anything that night, but she later located some emails in her deleted files. The emails were of a general nature and did not relate specifically to Lane. The emails provided that mail thieves tend to target places where businesses receive checks near the first of the month or the

6

end of the month when people pay their bills.

## II. Procedural Background

On November 18, 2015, Lane and Campbell were charged in a two-count indictment. *See* Indictment [DE-1]. In Count One, Lane is charged with possession of stolen mail and aiding and abetting, in violation of 18 U.S.C. §§ 1708 and 2. *Id.* at 1. Count Two charges Lane with obstruction of correspondence and aiding and abetting, in violation of 18 U.S.C. §§ 1702 and 2. *Id.* at 2.

Lane filed his Motion to Suppress [DE-23] on February 12, 2016. On February 25, 2016, the Government filed a Response [DE-24]. Lane filed a Reply [DE-25].

The court held a suppression hearing on March 17, 2016. At the suppression hearing, the Government was represented by Assistant United States Attorney Sebastian Kielmanovich. Lane was present at the hearing with his appointed counsel, Assistant Federal Public Defenders Marshall H. Ellis and Jennifer A. Dominguez.

## III. Discussion

Lane seeks suppression of all physical evidence obtained by law enforcement officers as a result of the unlawful seizure of his person and the subsequent search of his car. Mot. Suppress [DE-23] at 1. Lane argues that the court find that he was illegally seized by Corporal Hansen, Officer Boyd, and Officer Warren when they restrained his freedom to walk away from a police encounter. *Id.* Lane also argues that the ensuing search of his car further violated his Fourth Amendment rights. *Id.* Finally, Lane claims that all physical evidence recovered from the search of his car, including twenty-two pieces of U.S. Mail, must be suppressed. *Id.*

7

**I. The Fourth Amendment was not implicated when Corporal Hansen approached Lane and asked him a few questions.**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. "This guarantee does not extend to all police-citizen encounters." *United States v. Jones*, 678 F.3d 293, 298-99 (4th Cir. 2012). A law enforcement officer does not seize an individual "merely by approaching [him] on the street or in other public places and putting questions to [him]." *United States v. Drayton*, 536 U.S. 194, 200 (2002). Rather, as the Supreme Court has stated, "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968).

When assessing whether a police officer has displayed a show of authority that implicates the Fourth Amendment, the court applies the objective test set forth in *United States v. Mendenhall*, 446 U.S. 544 (1980). Law enforcement has displayed a show of authority that implicates the Fourth Amendment only if, in light of all the circumstances surrounding the incident, "a reasonable person would have believed he was not free to leave." *Mendenhall*, 446 U.S. at 554; *United States v. Stover*, 808 F.3d 991, 995 (4th Cir. 2015).

In this case, Corporal Hansen did not activate her vehicle's blue lights when she was behind Lane, and she did not block Lane's vehicle when she parked. Campbell exited the passenger side of the car and went into the store. As Lane got out of his car and started to walk toward the store's front door, Corporal Hansen asked, "Do you mind if I talk to ya?"

Lane responded, "Yeah."

8

Corporal Hansen asked a few other questions, including whether Lane had a valid driver's license. After it took Lane longer than normal to produce a driver's license, he produced a twenty-day temporary paper license from DMV. While Corporal Hansen was back at her car running Lane's license, Officer Boyd came back to her car holding a large machete he saw in plain view between the driver's seat and the door of Lane's car. Corporal Hansen learned that Lane's license was revoked with a pick up order. Lane was seized at the point when he was taken into custody for DWLR and carrying a concealed weapon.

**II. Even if Corporal Hansen's initial questioning of Lane constituted a "seizure" for Fourth Amendment purposes, the officers were authorized to briefly detain Lane for investigative purposes because there was reasonable suspicion that criminal activity was afoot.**

The Fourth Amendment allows a police officer to temporarily detain a person for investigative purposes when there is reasonable suspicion "supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30). The reasonable suspicion standard is less demanding than probable cause and requires only "specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity." *United States v. Branch*, 537 F.3d 328, 336 (4th Cir. 2008) (citations omitted). "A host of factors can contribute to a basis for reasonable suspicion, including the context of the stop, the crime rate in the area, and the nervous or evasive behavior of the suspect." *United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013) (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)).

In this case, even if the interaction between Lane and Corporal Hansen was not a

9

voluntary encounter, Corporal Hansen had ample reasonable suspicion to stop Lane.
Furthermore, even though Officers Boyd and Warren's car partially blocked Lane's car at the
Sheetz gas station, the officers had reasonable suspicion to detain Lane for purposes of
conducting a brief investigation.

Corporal Hansen observed Lane's car traveling slowly at 12:51 a.m., the middle of the
night, on a weekday, in Pinnacle Park, a business park made up of businesses. None of the
businesses in Pinnacle Park were open at that time of night. Corporal Hansen was aware there
had been crime in the Pinnacle Park area, including damaged mailboxes and stolen mail.
When Corporal Hansen got behind Lane, he accelerated quicky, as if he was trying to get away
from Corporal Hansen. In light of these facts and the totality of the circumstances, the court
finds that the officers had reasonable suspicion to believe that criminal activity was afoot. Thus,
the officers were constitutionally authorized to stop and detain Lane to conduct a brief
investigation.

### III. Once Officer Boyd observed the machete in plain view inside Lane's car, the officers developed probable cause to search Lane's car pursuant to the automobile exception.

Pursuant to the "plain-view" doctrine, "if police are lawfully in a position from which
they view an object, if its incriminating character is immediately apparent, and if the officers
have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v.
Dickerson*, 508 U.S. 366, 375 (1993).

Under the "automobile exception," a police officer may conduct a warrantless search of a
vehicle "[i]f [it] is readily mobile and probable cause exists to believe it contains contraband."
*United States v. Brookins*, 345 F.3d 231, 235 (4th Cir. 2003) (quoting *Maryland v. Dyson*, 527

10

U.S. 465, 466 (1999)).

In this case, when Officer Boyd observed the partially concealed machete beside the driver's seat and the floor of Lane's vehicle, the officers had probable cause to search the car for the presence of additional concealed weapons. The search of the car uncovered an additional knife, a .45 handgun, some marijuana, magazine pouches, ammunition, debit and credit cards not bearing Lane or Campbell's names, and fifteen to sixteen pieces of U.S. Mail addressed to businesses in Pinnacle Park.

## IV. Conclusion

In light of the foregoing, Lane's Motion to Suppress [DE-23] is DENIED. This case will remain scheduled for arraignment and trial at the June 6, 2016 term of court.

SO ORDERED.

This, the _17_ day of May, 2016.

_____

JAMES C. FOX
Senior United States District Judge

11